Approved: _____
CHRISTOPHER J. DIMASE / SARAH E. PAUL
Assistant United States Attorneys

Before:    HONORABLE DEBRA FREEMAN
           United States Magistrate Judge
           Southern District of New York

**ORIGINAL**

**17 MAG. 5082**

- - - - - - - - - - - - - - - - x
                                 :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA         :
                                 :   Violations of
         - v. -                  :   18 U.S.C. § 1347, 2;
                                 :   42 U.S.C. § 1320a-7b
SUNITA KUMAR,                    :
                                 :   COUNTY OF OFFENSE:
              Defendant.         :   BRONX
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   ARTHUR LEPORE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
(Health Care Fraud)

   1.   From at least in or about January 2015, up to and including at least in or about December 2016, in the Southern District of New York and elsewhere, SUNITA KUMAR, the defendant, willfully and knowingly, did execute and attempt to execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, to wit, KUMAR engaged in a scheme to defraud Medicare and Medicaid by, among other things, submitting reimbursement claims to Medicare and Medicaid for prescription drugs that she represented had been distributed to customers but which in fact were never distributed.

   (Title 18, United States Code, Sections 1347 and 2.)

**COUNT TWO**
(Illegal Remuneration)

2. From at least in or about April 2016, up to and including at least in or about June 2016, in the Southern District of New York and elsewhere, SUNITA KUMAR, the defendant, willfully and knowingly, did offer and pay remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to persons to induce such persons to refer individuals to persons for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, to wit, KUMAR offered to pay, and in fact paid, kickbacks to individuals to obtain prescriptions that were reimbursable by Medicare and Medicaid.

(Title 42, United States Code, Section 1320a-7b(b)(2).)

The bases for my knowledge of the foregoing charges are, in part, as follows:

3. I have been a Special Agent with the FBI for approximately 8.5 years. I am currently assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs. During my tenure with the FBI, I have participated in a variety of health care fraud investigations, during the course of which I have interviewed witnesses and subjects, organized undercover operations, conducted physical surveillance, executed search warrants, reviewed Medicare and Medicaid claims data, bank records, phone records, Medicare and Medicaid beneficiaries' medical records, invoices, and other business records. I am familiar with the records and documentation maintained by pharmacies, the methods of payment for prescriptions, and the laws and regulations related to the administration of the Medicare and Medicaid programs. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## OVERVIEW OF THE SCHEME

4.     I have been involved in an investigation by the FBI and the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") of a health care fraud scheme orchestrated by SUNITA KUMAR, the defendant. As detailed below, KUMAR, while operating two pharmacies located in Brooklyn, New York, has conducted a multi-million dollar scheme to defraud Medicare and Medicaid programs by seeking reimbursement for prescription drugs that were never distributed to customers. Specifically, from in or about January 2015 through in or about December 2016, KUMAR obtained approximately $9 million in reimbursements from Medicare and Medicaid for prescription drugs that her pharmacies never actually dispensed. KUMAR defrauded Medicare and Medicaid into providing her with these reimbursements by obtaining prescriptions from other individuals, who were willing to forego delivery of the medications in exchange for a share of the reimbursed proceeds, in the form of kickbacks.

## BACKGROUND

5.     Based on my training, experience, and familiarity with Medicare and Medicaid programs, as well as my involvement in this investigation, I know the following, in substance and in part:

   a.     The Medicaid program is a federal and state health care program that provides health care benefits to individuals and families who meet specified financial and other eligibility requirements, and certain other individuals who lack adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services, is responsible for overseeing the Medicaid program in New York State. Individuals who receive benefits under Medicaid are referred to as "beneficiaries."

   b.     Medicaid provides coverage to its beneficiaries for prescription drugs. Medicaid beneficiaries can obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment, or through Medicaid Managed Care plans, which are administered by insurance companies that are paid by Medicaid.

c. The Medicare program is a federal health care program providing benefits to persons who are over the age of 65 or disabled. Medicare is also overseen by CMS. Individuals who receive benefits under Medicare are also referred to as beneficiaries.

d. Medicare, like Medicaid, provides coverage to its beneficiaries for prescription drugs. That prescription drug coverage is provided through Medicare Part D, which is administered by insurance companies that are reimbursed by Medicare through CMS.

e. Both Medicare and Medicaid are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

f. When a beneficiary of Medicare or Medicaid seeks to obtain medication from a pharmacy, the pharmacy provides the medication to the beneficiary at little or no cost to the beneficiary. The cost to the pharmacy is typically reimbursed in whole or in part by the Medicaid and Medicare programs. Moreover, in the normal course, pharmacies bill Medicaid and Medicare for prescription drugs that the pharmacies have purchased from licensed wholesalers.

### KUMAR'S SCHEME TO DEFRAUD MEDICAID AND MEDICARE AND TO PAY ILLEGAL KICKBACKS

6. Based on my review of publicly available records, I know that between in or about January 2015 and in or about December 2016, SUNITA KUMAR, the defendant, and her husband were the owners of two pharmacies, both located in Brooklyn, New York. Specifically, KUMAR's husband was the legal owner of one of the two pharmacies ("Pharmacy-1"), and KUMAR herself was the legal owner of the other pharmacy ("Pharmacy-2").

7. As part of the investigation of SUNITA KUMAR, the defendant, the FBI utilized a cooperating witness (the "CW").[1]

---

[1] The CW has pleaded guilty to federal charges in connection with his participation in a scheme to defraud a health care benefit program, in violation of Title 18, United States Code, Sections 1347 and 2, and for paying kickbacks to individuals to induce those individuals to refer customers to

Based on my [other sources], and my involvement in this investigation, I know the following, in substance and in part:

    a. The CW previously owned Pharmacy-1. The CW sold Pharmacy-1 to KUMAR's husband in or around October 2014, and thereafter continued working at Pharmacy-1 as a supervising pharmacist. The CW had previously participated in a separate but similar scheme to defraud health care benefit programs by obtaining prescriptions that were billed to Medicare and Medicaid but not actually dispensed.

    b. The CW has informed the FBI, among other things, that: (i) KUMAR managed the day-to-day operations of both Pharmacy-1 and Pharmacy-2; (ii) when the CW owned Pharmacy-1, the CW worked with a customer of Pharmacy-1 who was a Medicare/Medicaid beneficiary ("Beneficiary-1"), and paid kickbacks to Beneficiary-1 for providing prescriptions to the CW based upon which the CW submitted fraudulent bills to Medicare and Medicaid; and (iii) following the CW's sale of Pharmacy-1 to KUMAR's husband, Beneficiary-1 continued to receive kickbacks from KUMAR for providing prescriptions to KUMAR based upon which KUMAR submitted fraudulent bills to Medicare and Medicaid.

<u>Telephone Calls with the CW on May 28, 2015</u>

8. On or about May 28, 2015, at the direction of law enforcement, the CW twice called SUNITA KUMAR, the defendant, and recorded both calls. Following the calls, I listened to the two recordings. From my review of the recordings, and from speaking with the CW about the calls, I have learned that during the calls, the following occurred, in substance and in part:[2]

---

the CW's pharmacy to obtain prescription drugs that were reimbursable by Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2). The CW has been cooperating with the Government in this investigation in the hope of obtaining a more lenient sentence for those offenses. The information provided by the CW during the course of this investigation has proven to be reliable and corroborated by other evidence.

[2] The quotations from the calls set forth below are based on draft transcriptions of the recorded calls.

a. The CW asked whether or not KUMAR was meeting with Beneficiary-1 to "give him the money," i.e., pay kickbacks to Beneficiary-1 for prescriptions. KUMAR responded that she met with Beneficiary-1 herself to "take care of him."

b. KUMAR expressed to the CW that KUMAR wanted the CW to initial unfilled prescriptions at Pharmacy-1, referring to the requirement that a pharmacist initial prescriptions to verify that they have been filled properly and actually have been dispensed to the customer. The CW responded by pointing out that KUMAR was the owner of Pharmacy-1 and stating, "Why should I do all of this illegal shit and put it under my name, for what? . . . It's not my pharmacy, I'm not getting anything out of it, right? . . . If anything happens, are you going to pay for my lawyer, are you going to bail me out of jail if something happens? . . . I'm not the one giving people money, I'm not the one talking to the customers." KUMAR responded, "What's gonna happen?"

c. The CW stated to KUMAR that she did not "have to do it" – meaning pay kickbacks to beneficiaries as part of a scheme to bill Medicare and Medicaid for unfilled prescriptions – if she did not "want to do it." KUMAR responded, "How would I sustain the business? At least you could do that for us to sustain the business for now."

d. The CW and KUMAR discussed involving another employee at Pharmacy-1 (the "Employee") in the scheme. The CW stated, "I wouldn't even tell [the Employee] about this shit because if [the Employee] finds out what you're doing he might report you himself. I wouldn't tell [the Employee] about that. You're gonna get us both in trouble." KUMAR responded, "[The Employee] ran a pharmacy himself, and, you know, everybody knows what goes on."

e. The CW subsequently stated, "If I'm the supervising pharmacist, that means that I'm in charge, and that means that I know all of this billing stuff is going on. If I put my signature on there also, that whatever prescriptions . . . that aren't being given out, and then you're taking care of the patients. Do you want me to take care of the patients also, you want me to deal with them and give them money and do everything that you're doing too, or are you still going to do that?" In response, KUMAR stated, "Is that what you want to do?

6

. . . I mean, it doesn't matter to me. If you want to do that, how you want take care of it . . . ."

  f. The CW stated, "If you get checked and they see you're not ordering medication, what are you going to say?" KUMAR responded, "Nobody is going to say, and [nothing] is going to happen."

<u>Telephone Call with the CW on November 16, 2015</u>

  9. On or about November 16, 2015, at the direction of law enforcement, the CW called SUNITA KUMAR, the defendant, and recorded the call. Following the call, I listened to the recording. From my review of the recording, and from speaking with the CW about the call, I have learned that during the call, the following occurred, in substance and in part:

  a. The CW and KUMAR discussed complaints being raised by Beneficiary-1 to the effect that KUMAR was filling too many of the prescriptions submitted by Beneficiary-1 at Pharmacy-1, rather than paying Beneficiary-1 cash for the prescriptions and not filling them, as Beneficiary-1 preferred. For example, the CW stated to KUMAR that Beneficiary-1 was "complaining about that [KUMAR] gave him back like five bottles of Lovaza, the generic," rather than paying Beneficiary-1 for the prescriptions. KUMAR responded, "Yeah, because uh… If the cost of the medicine is less than what I'm going to give him back, then what's the point to me doing it?"

  b. KUMAR further stated, "And you know, on those Lovaza, if he wants to take 20 percent maybe then it's worth it," meaning that KUMAR was willing to pay Beneficiary-1 twenty percent of the Medicaid reimbursement amount for Lovaza prescriptions provided by Beneficiary-1. KUMAR continued, "Otherwise, it's like the medication costs $110 and I'm going to give [Beneficiary-1] $70, what's the point? . . . It doesn't work for us . . . I'm losing money to give him money."

  c. Based on my familiarity with this investigation, information provided by the CW, and my review of this call, I understand KUMAR to be saying that she believed paying Beneficiary-1 for prescriptions not dispensed but nevertheless billed to Medicare or Medicaid was only financially viable if Beneficiary-1 agreed to accept smaller kickback payments.

7

        d.    Later in the call, the CW stated to KUMAR that going forward, Beneficiary-1 would agree to kickback payments at a rate of twenty percent.

<u>Meeting with an Undercover Officer on April 8, 2016</u>

        10.    In or about early April 2016 – at the direction of law enforcement and as part of a plan to introduce an undercover law enforcement officer posing as a Medicaid beneficiary to SUNITA KUMAR, the defendant - the CW contacted KUMAR about a purported former Medicaid beneficiary who frequented Pharmacy-1. In fact, no such beneficiary existed; instead, an undercover officer planned to pose as the beneficiary in future meetings with KUMAR. This call with KUMAR was not recorded, but I have spoken to the CW about the substance of the call. During the call, at the direction of law enforcement, the CW told KUMAR, in substance and in part, that a former beneficiary at Pharmacy-1 was moving to the vicinity of Pharmacy-2. The CW further stated to KUMAR that the beneficiary would meet with KUMAR at Pharmacy-2 in the near future.

        11.    On or about April 8, 2016, an undercover law enforcement officer posing as a Medicaid beneficiary (the "Undercover") met with SUNITA KUMAR, the defendant, at Pharmacy-2 in Brooklyn, New York. The Undercover was equipped with an audio and video recording device during the meeting, and other law enforcement agents, including myself, conducted surveillance of the meeting. Following the meeting, I listened to the recording, and I also reviewed a draft transcript of the recording. From my review of the recording and transcript, and from speaking with the Undercover about the meeting, I have learned that during the meeting, the following occurred, in substance and in part:

        a.    The Undercover entered Pharmacy-2 and asked, "Is Sunita here?" KUMAR then came to the pharmacy counter to assist the Undercover. The Undercover stated to KUMAR, "[The CW] sent me . . . [The CW] from [Pharmacy-1] . . . I have two scripts, Lovaza and Soleraze." KUMAR asked for the Undercover's card, and the Undercover provided KUMAR with a Medicaid benefit card in the name of an individual ("Individual-1"), whose identity the Undercover had assumed. The Medicaid benefit card for Individual-1 showed that Individual-1 was insured by a Medicaid Managed Care plan ("Medicaid Insurer-1"), which is a real company located in Queens, New York. The Undercover also

8

provided KUMAR with two prescription forms in the name of Individual-1 for: (i) "Lovaza," a brand name for omega-3-acid ethyl esters, a cholesterol medication; and (ii) "Soleraze," a brand name for diclofenac sodium gel, a topical analgesic and anti-inflammatory medication. Both prescription forms specified that the prescriptions could be refilled three times.

        b.    During the meeting between the Undercover and KUMAR, KUMAR stated that she did not have Soleraze in stock and asked if the Undercover wanted it delivered later. The Undercover stated, "I really don't need it. You could just hold onto it, it's fine. If you could just take care of me for one, then you could just keep the other one," meaning that KUMAR could fill just one of the two prescriptions and pay the Undercover a kickback for the other prescription. In a hushed tone, KUMAR responded, "What are you expecting?" The Undercover replied "Whatever deal [the CW] told you." KUMAR indicated that she would have to fill one of the two prescriptions, to which the Undercover responded, "You can put it in the garbage." KUMAR did not dispense any medication to the Undercover, and instead handed to the Undercover $50 in U.S. currency.

    12.    Based on my review of billing records, I know that following the April 8, 2016 meeting, Pharmacy-2 billed Medicaid Insurer-1 for the two prescriptions in the name of Individual-1, for omega-3-acid ethyl esters (the generic version of Lovaza) and diclofenac sodium gel (the generic version of Soleraze), neither of which KUMAR actually dispensed to the Undercover.

<u>Meeting with the Undercover on June 15, 2016</u>

    13.    On or about June 15, 2016, the Undercover again met with SUNITA KUMAR, the defendant, at Pharmacy-2 in Brooklyn, New York. The purpose of the meeting was for the Undercover to collect kickback money from KUMAR, in connection with refills for the above-described prescriptions in the name of Individual-1. The Undercover was equipped with an audio and video recording device, and other law enforcement agents, including myself, conducted surveillance of the meeting. Following the meeting, I listened to the recording. From my review of the recording, and from speaking with the Undercover about the meeting, I have learned that during the meeting, the following occurred, in substance and in part:

9

        a. The Undercover entered Pharmacy-2 and asked for "Sunita." KUMAR then came to the pharmacy counter to assist the Undercover. The Undercover provided Individual-1's name and stated to KUMAR, "I'm here for my refills . . . [The CW] sent me, remember last time? I don't need them, if you could just give them, same as last time." KUMAR did not dispense any medication to the Undercover, and instead handed to the Undercover a brown paper bag containing $70 in U.S. currency.

      14. Based on my review of billing records, I know that following the June 15, 2016 meeting, Pharmacy-2 billed Medicaid Insurer-1 for the prescription refills in the name of Individual-1, for omega-3-acid ethyl esters (the generic version of Lovaza) and diclofenac sodium gel (the generic version of Soleraze), neither of which KUMAR actually dispensed to the Undercover.

### Additional Billing for Undispensed Prescription Refills

      15. Based on my review of billing records, I have learned, among other things, that on or about May 5, 2016, Pharmacy-2 billed Medicaid Insurer-1 for prescription refills for omega-3-acid ethyl esters (the generic version of Lovaza) and diclofenac sodium gel (the generic version of Soleraze) in the name of Individual-1. The Undercover did not appear at Pharmacy-2 on May 5, 2016, and KUMAR never dispensed either of the medications to the Undercover.

### Analysis of KUMAR's Billing and Purchasing Records

      16. I have reviewed the Medicare and Medicaid billing records of Pharmacy-1 and Pharmacy-2 for the period from in or about January 2015 through in or about December 2016. I have compared those billing records with the records of Pharmacy-1 and Pharmacy-2 prescription drug purchases for the same time period, which I obtained from the licensed wholesalers who sell medications to Pharmacy-1 and Pharmacy-2.[3] In comparing the pharmacies' billing records for this time period to the records of the pharmacies' purchases, I have learned that Pharmacy-1 and

---

[3] I identified the licensed wholesalers that supplied medications to Pharmacy-1 and Pharmacy-2 by reviewing bank records for business accounts associated with the two pharmacies, to determine which licensed wholesalers were paid for purchases of medications.

10

Pharmacy-2 billed Medicare and Medicaid for far more units of medication than Pharmacy-1 and Pharmacy-2 actually purchased from licensed wholesalers.

      a.    For instance, Pharmacy-1 and Pharmacy-2 billed Medicare and Medicaid for approximately 2,640 units of Lovaza and approximately 99,150 units of omega-3-acid ethyl esters, but zero units of Lovaza and only 2,520 units of omega-3-acid ethyl esters were purchased by Pharmacy-1 and Pharmacy-2.

      b.    Similarly, Pharmacy-2 billed Medicare and Medicaid for approximately 6,100 units of diclofenac sodium gel, but zero units of diclofenac sodium gel were purchased by Pharmacy-2.

      c.    Moreover, Pharmacy-2 billed Medicare and Medicaid for approximately 33,486 units of Lantus SoloStar, an insulin pen medication used to treat diabetes, but only 10,815 units of Lantus SoloStar were purchased by Pharmacy-2.

      d.    Furthermore, Pharmacy-2 billed Medicare and Medicaid for approximately 29,108 units of Clopidogrel, a blood thinning medication used to treat heart problems, but zero units of Clopidogrel were purchased by Pharmacy-2.[4]

17. Based on my comparison of these records, moreover, I believe that SUNITA KUMAR, the defendant, has caused significant losses to Medicare and Medicaid by billing for prescription drugs that Pharmacy-1 and Pharmacy-2 never ordered or distributed to customers. Specifically, I estimate that during the time period from in or about January 2015 through in or

---

[4] I have identified a beneficiary ("Beneficiary-2") named on several prescriptions for Clopidogrel - a medication never purchased by Pharmacy-2 during the relevant time period - that were fraudulently billed to Medicaid. During the relevant time period, Beneficiary-2 was insured by a Medicaid Managed Care plan located in the Bronx, New York ("Medicaid Insurer-2"). I am informed by a special agent with HHS-OIG (the "HHS-OIG Agent"), that the HHS-OIG Agent communicated with a representative (the "Representative") of a company that has contracted with Medicaid Insurer-2 to assist with the Medicaid claims billing and payment process. The Representative informed the HHS-OIG Agent that when pharmacies bill Medicaid Insurer-2, the claims are submitted to Medicaid Insurer-2's server in the Bronx, New York.

about December 2016, KUMAR caused over $9 million in losses to Medicare and Medicaid in the form of reimbursements for prescription drugs that she did not order or dispense.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SUNITA KUMAR, the defendant, and that she be arrested and imprisoned, or bailed, as the case may be.

_____
ARTHUR LEPORE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
7th day of July, 2017

_____
THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK